# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**CASANDRA HERNÁNDEZ**,
Plaintiff

v.

**WILLIAM BARR**,
Defendant.

Civil No. 17-2280-BJM

## <u>OPINION AND ORDER</u>

William Barr,[1] in his official capacity as Attorney General of the United States, moves for summary judgment in the Title VII lawsuit filed by Casandra Hernández. Dkt. 24. Hernández's suit arises from her alleged treatment at her job in the Drug Enforcement Administration's ("DEA") Ponce District Office in Puerto Rico. Dkt. 1 ("Compl."). Hernández alleges discrimination on the basis of disability and national origin, sexual harassment, and retaliation for her discrimination complaints. *Id.* She opposed the motion for summary judgment. Dkt. 28. Barr ("the government") responded. Dkt. 33. The parties have consented to proceed before a magistrate judge. Dkt. 15. For the reasons set out below, the government's motion for summary judgment is **GRANTED**.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" only if it "is one that could be resolved in favor of either party." *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004). A fact is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions" of the record materials "which it

---

[1] Since this case was filed, there has been a leadership change at the Department of Justice. The Senate confirmed William Barr as Attorney General of the United States on February 14, 2019, so he is automatically substituted as the defendant pursuant to Federal Rule of Civil Procedure 25(d).

believes demonstrate the absence" of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The court does not act as trier of fact when reviewing the parties' submissions and so cannot "superimpose [its] own ideas of probability and likelihood (no matter how reasonable those ideas may be) upon" conflicting evidence. *Greenburg v. P.R. Mar. Shipping Auth.*, 835 F.2d 932, 936 (1st Cir. 1987). Rather, it must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Griggs-Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir. 1990). The court may not grant summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. But the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and may not rest upon "conclusory allegations, improbable inferences, and unsupported speculation." *Medina-Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990). "To defeat a properly supported motion for summary judgment, the nonmoving party must establish a trial-worthy issue by presenting 'enough competent evidence to enable a finding favorable to the nonmoving party.'" *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 842 (1st Cir. 1993) (quoting *Goldman v. First Nat'l Bank of Boston*, 985 F.2d 1113, 1116 (1st Cir. 1993)).

# BACKGROUND

Except where otherwise noted, the following facts are drawn from the parties' Local Rule 56[2] submissions and presented in the light most favorable to the non-moving party.[3] The parties substantially agree on this case's history, with few disputed issues.

Hernández was born in Puerto Rico. Compl. 1. She is female, and she is both of Puerto Rican and Hispanic origin and "displays physical, cultural and linguistic characteristics of the said groups." Compl. ¶¶ 1.42, 1.3. Hernández has worked for the Drug Enforcement Administration ("DEA") for more than eighteen years. SUF ¶ 1; OSF ¶ 1. She began as a secretary in the High Intensity Drug Trafficking ("HIDTA") office in Ponce, Puerto Rico and moved to the Diversion Office in Ponce in 2010, where she worked as an Investigative Assistant. SUF ¶¶ 10–12; OSF ¶ 1. As an Investigative Assistant, Hernández assisted HIDTA Task Force officers and handled administrative work. SUF ¶ 12; OSF ¶ 1. Shortly before January 2016, Hernández began training for her current position of Assistant Special Agent in Charge ("ASAC") Secretary. SUF ¶ 13; OSF ¶ 1. She worked in both the Ponce Diversion Office and the Ponce District Office, until she officially transferred to the Ponce District Office in January 2016. SUF ¶ 14; OSF ¶ 1.

As a DEA employee, Hernández participated in mandatory, annual online trainings on federal employee antidiscrimination and retaliation laws as well as in-classroom training on the

---

[2] Local Rule 56 is designed to "relieve the district court of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute." *CMI Capital Market Inv. v. Gonzalez-Toro*, 520 F.3d 58, 62 (1st Cir. 2008). It requires a party moving for summary judgment to accompany its motion with a brief statement of facts, set forth in numbered paragraphs and supported by citations to the record, that the movant contends are both uncontested and material. D.P.R. Civ. R. 56(b), (e). The opposing party must admit, deny, or qualify those facts, also with record support, paragraph by paragraph. *Id.* at 56(c), (e). The opposing party may also present, in a separate section, additional facts, set forth in separate numbered paragraphs. *Id.* at 56(c). When the moving party replies to the opposition to a motion for summary judgment, that reply must include a statement of material facts limited to those submitted by the opposing party. D.P.R. Civ. R. 56(d). Like the party's initial statement, this reply must "admit, deny, or qualify those additional facts by reference to the numbered paragraphs of the opposing party's statement of material facts." *Id.* While the "district court may forgive a party's violation of a local rule," litigants ignore the Local Rule "at their peril." *Mariani-Colón v. Dep't of Homeland Sec. ex rel. Chertoff*, 511 F.3d 216, 219 (1st Cir. 2007).

[3] Defendant's Statement of Material Uncontested Facts ("SUF"), Dkt. 25; Plaintiff's Opposition to Defendant's Statement of Material Uncontested Facts ("OSF"), Dkt. 30; Defendant's Reply to Plaintiff's Opposition to Statement of Material Uncontested Facts ("RSF"), Dkt. 33-1.

same subjects led by an Equal Employment Opportunity ("EEO") Commission employee. SUF ¶¶ 3–4; OSF ¶ 1. The trainings addressed what constitutes prohibited conduct and how employees could file complaints and grievances about prohibited conduct. SUF ¶ 5; OSF ¶ 1. Memoranda addressing DEA policies on discrimination and retaliatory harassment were distributed to DEA employees and posted on the walls in Hernández's office, and she read the documents, which included rules and regulations that affected her, stated her employee rights, and provided contact information to seek advice or relay concerns. SUF ¶¶ 6–9; OSF ¶ 1.

DEA inspections at the Ponce District Office turned up a number of problems; at least one team, to which Hernández was assigned, feel below productivity standards. SUF ¶ 17; OSF ¶ 4. Hernández was not named in those reports. *Id.* In July 2016, ASAC Dave Joseph ("Joseph") was assigned to the Ponce District Office and replaced Israel Alicea as Hernández's new, first line supervisor. SUF ¶¶ 14, 16; OSF ¶ 1, 3. Joseph, unlike Alicea, would be permanently stationed in Ponce to oversee all operations and administrative matters. SUF ¶ 18–19; OSF ¶ 5. "Joseph was expressly directed to bring production up, make changes, and make sure people started conducting quality investigations, reporting to work on time, and [monitoring] employee's late arrivals or absences, in order to have more accountability in the office." SUF ¶ 19; OSF ¶ 5. The parties disagree on how Joseph explained his assignment to the Ponce Office, but they concur that he was going to make changes to the office and do things differently than Alicea had. SUF ¶ 22; OSF ¶ 6; Dkt. 33 ¶ 3. Hernández alleges that "[Joseph said] that the office was a mess and he wanted to get rid of some of the personnel there in Ponce, he was putting some of the personnel down and saying things badly about the office." OSF ¶ 6.

Under Joseph's supervision, Hernández performed secretarial duties and administrative tasks, including serving as the Imprest Fund cashier, Purchase Card Holder, Records Coordinator, and Time and Attendance Keeper. SUF ¶ 23; OSF ¶ 7. The Imprest Fund is the fund of money from which agents draw in order to perform field operations; Hernández's role as cashier was essential to supporting DEA investigators and the Office's mission. SUF ¶¶ 24–26; OSF ¶ 7. Hernández had the same duties as Imprest Fund cashier when Alicea supervised her. SUF ¶ 26; OSF ¶ 7. As the

cashier, Alicea had assigned Hernández to work in the Imprest Fund room, which contained the safe where the money was kept. SUF ¶¶ 27, 32; OSF ¶¶ 7; 9.

The month before Joseph arrived in the Ponce District Office, Hernández learned that an EEO complaint she filed against Special Agent Jasmine Carter had been dismissed. SUF ¶ 34; OSF ¶ 11. Hernández filed the complaint in December 2015 against Carter because the two "got into a verbal altercation" after Hernández's transfer to the office. SUF ¶ 35; OSF ¶ 11. This marked Hernández's second EEO complaint—she submitted the first in 2000 or 2001 to process a work evaluation grievance because she had "a difference of opinion as to how she was evaluated." SUF ¶ 38; OSF ¶ 13. The EEO complaint was dismissed in June 2016 because Carter's negative remarks about Hernández's "age, dress, and how she was not liked" fell below the baseline for verbal harassment. SUF ¶ 37; OSF ¶ 12. That August, Hernández informed Joseph that she had filed the EEO complaint against Carter for discrimination. SUF ¶ 34; OSF ¶ 11.

On September 8, 2016, Hernández requested to relocate her workstation from the Imprest Fund room to a contractor desk because the camera at her workstation made her feel uncomfortable. SUF ¶ 39; OSF ¶¶ 14, 30. The room contained cameras as a security measure to monitor the safe and the window at which funds were dispensed. SUF ¶¶ 32–33; OSF ¶¶ 9–10. Hernández believed that the camera could detect her text messages, which the government disputes. OSF ¶ 30; RSF ¶ 7. Joseph approved the move but then changed his mind because the proposed new location was near Carter's desk, and he did not want Carter and Hernández seated near each other. *Id.* Hernández agrees that Joseph, as ASAC, must manage personnel for efficiency and effectiveness, which includes maintaining office morale. SUF ¶ 40; OSF ¶ 15. In mid-December of 2016, Hernández requested to see the Imprest Fund room camera views. SUF ¶ 42; OSF ¶ 15. Joseph granted permission, and Hernández was able to see where and what the camera in her office recorded with the assistance of Walter Aponte, the Investigative Technology Specialist. SUF ¶¶ 41, 42; OSF ¶ 15. The government alleges that Joseph and his supervisor, Special Agent in Charge (SAC) Matthew Donahue, subsequently authorized Hernández to install partitions in her office to shield he work area from the camera's view without impeding its

surveillance of the safe and dispensing window. SUF ¶ 43. When he showed her the camera views in late December 2016 or early January 2017, Aponte told Hernández where she could place the partitions to create some privacy. *Id.* Hernández disputes that any privacy would be possible because "the ADT technicians who install the camera said that the proposed partition installation would be worthless." OSF ¶¶ 16; 17. Hernández, despite permission to put up the partitions and Aponte's information, chose not to put in paperwork for their installation. SUF ¶ 44.

Hernández fractured her foot in late September 2016; the injury was not work-related. SUF ¶ 47; OSF ¶ 19. She texted Joseph in early October to inform him of her foot injury. SUF ¶ 48; OSF ¶ 19. By October 5, 2016, Joseph received a medical certificate from Hernández's doctor. *Id.* The certificate stated that Hernández required rest from October 3 through October 28, though Hernández came to work anyway. SUF ¶ 49; OSF ¶ 19. Joseph authorized Hernández, via email, to park in a different location in the parking garage until she recovered so that she could avoid walking up seven flights of stairs to the office. SUF ¶ 50; OSF ¶ 19. During the pay period from October 2 through October 15, 2016, Hernández had a balance of six hours of annual leave and a deficit of over 134 hours of sick leave. SUF ¶ 59; OSF ¶ 21. Hernández ended up in a sick leave deficit in 2015, when she was diagnosed with a blood condition and forced to take time off work for testing, treatment, surgery, and recovery. SUF ¶¶ 60–61; OSF ¶ 21. The condition does not limit her ability to perform her job, so Hernández never requested a reasonable accommodation for it. SUF ¶ 62; OSF ¶ 21.

The next week, Hernández sent Joseph a written request to downgrade from her current position as ASAC Secretary to her former job Investigative Assistant. SUF ¶ 51; OSF ¶ 19. The parties agree that, on reading, Joseph and two supervisors thought the request sounded as if Hernández were accusing him of sexual harassment. SUF ¶ 52; OSF ¶ 19. Hernández then offered to rephrase the document because "it was not her intention to accuse anyone of sexual harassment, and that sexual harassment had not occurred." SUF ¶ 53; OSF ¶ 19. Hernández, at her deposition, stated that "up until that moment, October 12, 2016, she had not charged anyone at the DEA with sexual harassment, nor did she have information to conclude that she was being sexually harassed."

*Id.* Hernández rephrased the request, referring in it to "professional/confrontational issues" rather than "uncomfortable incidences" and sent it to SAC Donahue. SUF ¶ 54; OSF ¶ 19. The request stated, "Mrs. Hernandez does not feel at ease, comfortable or at peace in the HIDTA Ponce office," and she wishes to be demoted to avoid further confrontations with Joseph. Dkt. 25-20. The government is correct that Hernández does not cite her temporary disability or request for accommodations, and Hernández is correct that she asked for the demotion to avoid professional confrontations. SUF ¶ 50; OSF ¶ 20. Hernández later stated that Joseph "mocked" her and made her change the wording of the request; this contradicts her earlier admission that she offered to rephrase the request. OSF ¶¶ 19, 42; SUF ¶ 53.

In Hernández's first meeting with Joseph in which she sought a downgrade to her old job and office, she recalls Joseph having said, "'Those people', 'Your people', 'The people that you defend', and 'You go tell Iván Lugo'." SUF ¶ 87; OSF ¶ 30. This likely occurred during the October 12, 2016 meeting, but neither party provides a date. *See* SUF ¶ 51; OSF ¶ 19. These comments led Hernández to infer that Joseph thought she was part of the "Puerto Rican Mafia" a phrase she heard from other employees that Joseph had used. SUF ¶¶ 86, 87; OSF ¶ 30. Hernández never heard Joseph say "Puerto Rican Mafia" or heard him refer to it; she has only heard from other employees that he used the phrase, and she does not know in what context it was said. SUF ¶¶ 85, 86; OSF ¶ 30. Neither party clarified who Iván Lugo is in their briefings. Nevertheless, Hernández agrees with the government that "the messages ASAC Joseph wished for her to take to Iván Lugo had to do with his impressions that both offices, Ponce District and Diversion, were a mess and that he wanted to get rid of personnel." SUF ¶ 88; OSF ¶ 30. Hernández further agrees that "ASAC Joseph would tell her that the supervisors were not good, while putting personnel down, which she did not like, and thus she chose not to pay much attention to that." *Id.*

Donahue rejected the downgrade request the next day, explaining that the DEA already selected a person with the skills needed for the position. At a meeting, he informed Hernández that the group to which she sought assignment, located in the Diversion Office, received poor evaluations from DEA inspections and he wanted to make a change that would improve its

productivity and accountability. Donahue further explained that not wanting to work with Joseph and not liking Joseph did not justify the downgrade, especially when she would remain under his chain of command even if she were downgraded. SUF ¶¶ 56–58; OSF ¶ 21.

A few days later, on October 17, 2016, Hernández requested approval for advanced sick leave from Joseph. SUF ¶ 64; OSF ¶ 21. Joseph, who had requested information about leave restriction guidelines from Human Resources ("HR") earlier that week, denied the request and placed Hernández on leave restriction. SUF ¶¶ 63, 67; OSF ¶ 21. Joseph did so after consulting with two HR staff members about Hernández's specific situation. SUF ¶ 66; OSF ¶ 21. He then issued a leave restriction letter, which is non-disciplinary and explains to the employee the some of the reasoning behind the decision, the employee's past behavior regarding leave, procedures under the leave restriction, and potential consequences for not following them. SUF ¶ 68; OSF ¶ 21. Hernández refused to formally acknowledge receipt of the leave restriction letter even though she agrees that approval was Joseph's prerogative, that he consulted with HR, and that she did not know what criteria supervisors may consider when deciding such requests. SUF ¶¶ 65, 67; OSF ¶ 21. After receiving the letter, Hernández was advised that she could participate in a program in which other employees donated their unused leave time; she enrolled in the program and received donations. SUF ¶ 69; OSF ¶ 21.

On October 21, 2016, two events of note occurred. Hernández submitted a request for reasonable accommodation accompanied by two certificates from her doctor, which certified that she needed rest from October 3 to November 11 and reasonable accommodation from September 30 to November 11. SUF ¶ 70; OSF ¶ 22. Neither certificate specified what type of accommodation Hernández required. *Id.* Hernández, for her part, sought to be accommodated by placement in the Diversion Office (to which she had earlier sought to be downgraded) because she believed it was more suited for a handicapped person. SUF ¶ 70. Hernández disputes the government's characterization of her request, but she clarifies only that the reasonable accommodation was due to her fractured foot, and she "asked to be placed in an office suitable for a handicap person." OSF ¶ 22. These accounts are not mutually exclusive. Rosa Torres, the reasonable accommodations

coordinator, explained that the alternative accommodations enabled Hernández to continue to perform her job because moving her out of the Ponce District Office would impact operations by preventing her from acting as the Imprest Fund cashier and shifting her, the ASAC Secretary, away from ASAC Joseph. SUF ¶ 78; OSF ¶ 28. The same day, Hernández contacted an EEO counselor regarding claims of discrimination based on national origin, disability, and retaliation. SUF ¶ 117; OSF ¶ 38.

Hernández's doctor issued another medical certificate, stating Hernández required rest and reasonable accommodations from that day, October 28, until November 18, but he did not specify what accommodation she required. SUF ¶ 71; OSF ¶ 23. Donahue consulted with Torres about the request. SUF ¶ 72; OSF ¶ 23. Donahue denied the relocation and authorized Hernández to continue parking on the drive-up ramp of the parking garage, to continue to use nonpaid leave for medial issues, and to use flex hours as needed until she healed. SUF ¶ 73; OSF ¶ 23. Donahue also noted that Hernández could apply to and use the leave donations program. *Id.*

On November 18, at the end of the prescribed rest period, Hernández's doctor issued another certificate recommending she undergo immobilization treatment for six more weeks. SUF ¶ 72; OSF ¶ 23. The doctor stated that she could work on limited duty for limited hours if she had to return, and he specified reasonable accommodations as no heavy lifting, no stairs, no slippery floors, and limited driving and standing. *Id.* According to Hernández, her doctor did not know what her work plan or duties entailed when he drafted the certificate. SUF ¶ 75; OSF ¶ 24 (objecting to but not contradicting the government's statement of facts). The doctor "just provided a set of recommendations for reasonable accommodations based on the condition of her foot." SUF ¶ 76; OSF ¶ 25. Hernández does not dispute that Donahue rejected the requested accommodation on November 25 or that he reiterated the alternative accommodations already made. SUF ¶ 77; *see generally* OSF.

After the November 18 medical certificate but before Donahue's denial of the request, Hernández filed a formal EEO complaint against Donahue and Joseph. SUF ¶ 117; OSF ¶ 38. On

November 22, 2016, Hernández claimed discrimination based on national origin, disability, and retaliation. *Id.*

Hernández continued to seek reasonable accommodations for her fractured foot. In late November, she requested a schedule change, so she could begin and end work thirty minutes later. SUF ¶ 80; OSF ¶ 27. Joseph authorized the change to begin the next day. *Id.* On December 8, 2016, Hernández's doctor advised that she could return to work on limited duty. He maintained similar restrictions on her activity, including no heavy lifting and limited standing and driving; he further advised reasonable accommodations without specifying any, but he stated that he could be contacted in case of any doubts. SUF ¶ 81; OSF ¶ 28. Furthermore, the doctor advised that Hernández should be careful with slippery floors. *Id.* The Ponce District Office had two reported falls due to slippery floors in July 2016, but no one had fallen since the janitor had been replaced. SUF ¶ 79; OSF ¶ 26 (clarifying but not contradicting the government's alleged fact).

Her period of temporary disability lasted from the date of her fracture on September 30 through December 27, when her doctor issued her a clean bill of health. SUF ¶¶ 83, 84; OSF ¶ 30. Throughout her period of temporary disability, Hernández admits that her doctor never certified that the position to which she sought to be downgraded was better suited to her handicap or that the Diversion Office would be a better fit for a handicapped person. SUF ¶ 82; OSF ¶ 29 (noting that Hernández personally thought the Diversion Office would be a better fit). The parties agree that, during her temporary disability, "she received pay for 86 hours of Annual Leave, 8 hours of Sick Leave, 12 hours of Other Paid Leave, and 174 hours through the Voluntary Leave Transfer Program (VLTP). She only had 8 hours of Leave Without Pay (LWOP) and was never charged with Absent Without Leave (AWOL)." SUF ¶ 84; OSF ¶ 30.

By December 13, 2016, Hernández characterizes her relationship with Joseph as "not good." SUF ¶ 46; OSF ¶ 19. Hernández alleges that Joseph "mocked and mistreated Hernandez, yelled at her and treated her badly in front of people." OSF ¶ 41. Hernández did not offer any specific instances in which this happened, and the government contests that any mockery or mistreatment occurred. RSF ¶ 23. She spoke to him rarely and avoided meeting with him; she

would request a third party's presence if they had to meet. *Id.* One of Hernández's duties as ASAC

Secretary was to take care of Joseph's calendar and alert him to meetings, but Joseph began to

coordinate his own meetings with the Ponce Mayor's Office in December. SUF ¶ 45; OSF ¶ 18.

Hernández does not contest, however, that she was not a formal liaison with the Mayor's Office

and nothing had stopped Joseph from scheduling his own meetings prior to December. SUF ¶ 45;

OSF ¶ 18.

An EEO counselor alerted Hernández in January 2017 that her November 22 complaint

had been accepted for investigation. SUF ¶ 118; OSF ¶ 38. The claims investigated were:

> whether she was discriminated against based on her national origin
> (Hispanic/Puerto Rican), disability, and reprisal (prior EEO activity), when she was
> subjected to harassment and discriminatory terms and conditions of employment,
> regarding office location and conditions; when she was placed on leave restriction,
> when she was charged 6 hours absent without leave (AWOL), and she was referred
> to as part of the "Puerto Rican Mafia."

*Id.*[4] Hernández admitted that the penultimate claim, that she was charged six AWOL hours during

her disability, never happened. *See* SUF ¶ 84; OSF ¶ 30. The final claims were for discrimination

and retaliation for the downgrade denial and for the denial of her reasonable accommodation

request. SUF ¶ 118; OSF ¶ 38. She alleged that retaliation occurred on November 28, 2016 and on

December 1, 13, and 15, 2016. Dkt. 25-44. The DEA contracted a private company to investigate

these claims. The company conducted the investigation by telephone interviews between January

and March 2017. Compl. ¶ 1.12; SUF ¶ 119; OSF ¶ 38. On July 28, 2017, the EEO notified

Hernández of her right to pursue civil action. Compl. ¶ 1.13.

On September 1, 2017, DEA Special Agent Phillip Jones insisted on performing an

unannounced audit of the Imprest Fund while Hernández was attending to a transaction. SUF ¶ 89;

OSF ¶ 30. The two argued, and Jones yelled, "Get the fuck out of my face!" at Hernández. *Id.* The

---

[4] Hernández's "office location and conditions" complaint refers in part to the state of the Ponce
District Office. She and the government agree that the poor working conditions, including rats, mildew, and
clogged sewage pipes, affected all employees. The most egregious incident involving a bathroom drainage
pipe running through Hernández's office occurred under Alicea's tenure and did not recur. SUF ¶¶ 29–31;
OSF ¶ 7–8. While dismaying, the parties agree on the facts, which are immaterial to Hernández's
discrimination and retaliation lawsuit.

incident, both parties agree, was purely employment related and had to do with the audit. SUF ¶ 93; OSF ¶ 32. Hernández and Jones received memoranda the same day from a supervisor; it reminded both employees that their conduct was unacceptable. SUF ¶ 90; OSF ¶ 30. The supervisor and management treated Hernández and Jones the same way in response to the incident. *Id.* After the incident, they did not have to work with one another: Donahue assigned Hernández to temporary duty in San Juan for two weeks, and Jones was later transferred to Africa. SUF ¶ 94; OSF ¶ 32. Hernández's pay and benefits were not interrupted by her temporary assignment to San Juan, and she teleworked from home after the assignment finished. SUF ¶¶ 95–96; OSF ¶¶ 33–34.

Hernández filed a police report about the incident on September 1, 2017, and she later filed an EEO complaint claiming Jones had sexually harassed her when he yelled, "Get the fuck out of my face!" and claiming reprisal. SUF ¶ 92; OSF ¶ 31. In the complaint, she also named Donahue and Joseph. Dkt. 25-47. It is not clear whether Hernández chose to telework or whether that was imposed upon her; she does not allege it as retaliatory or otherwise mention the assignment in her Complaint. OSF ¶ 33; RSF ¶ 18; *see generally* Compl.

Donahue rescinded Hernández's authorization for outside employment on October 12, 2017. SUF ¶ 99. Hernández does not have personal knowledge that Joseph had any involvement in the rescission. SUF ¶ 100; OSF ¶ 36. Hernández initially obtained that authorization to engage in outside employment, a baking business, from Donahue and Acting ASAC Juan Berrios by the end of December 2016. SUF ¶ 97. Such authorization, Hernández understood, could be revoked at any time should it interfere with DEA work, including a conflict of interest, public reputation, or the performance of duties. SUF ¶ 98; OSF ¶ 34. She stated that around when the authorization was revoked, she had baked and sold several cakes but was winding down her workload because of her health. SUF ¶ 101; OSF ¶ 36. Hernández maintains that the record does not show that her outside cake business interfered with her work, which Donahue gave as his reason for rescission. SUF ¶ 99; OSF ¶ 35.

The next week, Hernández received notice from Donahue of a proposed five-day suspension for unprofessional conduct charge, consisting of three specified incidents, and one

failure to follow instructions charge, consisting of five specified incidents. SUF ¶ 102; OSF ¶ 36. The last specification for the failure to follow supervisory instructions charge was "repeated counseling to Hernández about wearing inappropriate work attire." SUF ¶ 104; OSF ¶ 36. Donahue mentioned that employees, male and female, had witnessed Hernández's cleavage and her posterior when she bent over in inappropriately short dresses and skirts, and they felt "embarrassed and uncomfortable around her." *Id.*

Hernández wrote a 377-page response addressing the specified incidents and the charges. SUF ¶ 103; OSF ¶ 36. She asserts that the inappropriate attire specification constitutes sexual harassment. SUF ¶ 105; OSF ¶ 36. Receiving the notice from Donahue, Hernández explains, made her aware that she was being sexually harassed and watched. SUF ¶¶ 105–107; OSF ¶ 36. Prior to the October 18, 2017 letter, Hernández did not believe she was being sexually harassed. *Id.* The parties agree that "Hernández claims that ASAC Joseph would watch her all the time [in an inappropriate manner, and] she admits that he never said anything to her, nor did he ever approached her in a sexual way, therefore she did not understood it to be sexual harassment." SUF ¶ 108; OSF ¶ 36. The parties agree that "Joseph never engaged in conversations of a sexual nature, he never laid hands on her, he never asked her out, and never offered anything in exchange for having a sexual encounter with her." SUF ¶ 109; OSF ¶ 36.  Hernández states that Joseph did insist on having Hernández come into his office even though he knew she was uncomfortable in his presence." *Id.* Hernández further alleges, and the government disagrees, that she felt sexually harassed because "she was being constantly watched by her superiors when bending over at the office, Joseph was constantly looking at her, what made her felt uncomfortable with his presence." OSF ¶ 43; RSF ¶ 25.

Donahue's proposal, Hernández's response, and the supporting investigative file were submitted to a deciding official, Matthew Germanowski, to determine whether to uphold the five-day suspension.  SUF ¶ 111; OSF ¶ 37. He further considered Hernández's eighteen years at the DEA and her lack of a prior disciplinary record. SUF ¶ 112; OSF ¶ 38. The parties differ as to whether the record supported the charges, but Germanowski found "sufficient evidence to establish

the majority of the conduct specified." SUF ¶¶ 111, 112; OSF ¶¶ 37–38. The parties agree that Germanowski did not consider Hernández's prior EEO activity, her period of temporary disability and requests for reasonable accommodation, or her claims of sexual harassment. SUF ¶¶ 113–16; OSF ¶ 38. He approved the five-day suspension on November 7, 2017. SUF ¶ 111.

The EEO counselor investigating Hernández's September 12 complaint informed Donahue and Joseph of the EEO investigation on November 17, 2017 when they were interviewed. SUF ¶ 120; OSF ¶ 38. Hernández filed a formal complaint setting forth the sexual harassment and retaliation claims against Donahue and Joseph on December 8, 2017, but that was dismissed due to the filing of this lawsuit. *Id.* In December 2017, Hernández was removed from Joseph's supervision, and Donahue left Puerto Rico. SUF ¶ 110; OSF ¶ 36.

## DISCUSSION

### *Discrimination on the Basis of Disability*

The Rehabilitation Act, 29 U.S.C. § 794, protects federal employees from discrimination on the basis of temporary disability.[5] *Enica v. Principi*, 544 F.3d 328, 338 n.11 (1st Cir. 2008) (citing *Calero-Cerezo*, 355 F.3d at 11 n.1). The Rehabilitation Act borrows from the Americans with Disabilities Act to define its coverage. *See* 29 U.S.C. § 794(a). An individual who is disabled under the meaning of the Rehabilitation Act is one who has a substantially limiting physical or mental impairment, a record of such an impairment, or an individual who is regarded as having such an impairment. 42 U.S.C. § 12102(1). Being regarded as having an impairment which substantially limits one of more major life activities may include certain temporary impairments, like the fractured foot Hernández suffered, "whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A). The statute expressly excludes "impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less." *Id.* at § 12102(3)(B).

---

[5] Hernández incorrectly alleged violations of the Americans with Disabilities Act, which does not protect federal employees from workplace discrimination. The court will construe her claim under the Rehabilitation Act, which offers similar protections for federal employees.

Hernández alleged in her complaint that "she fractured her foot and was disabled for approximately five (5) months." Compl. ¶ 1.31. Her disability discrimination claims stem directly from this injury.[6] By her own admission, however, the period of disability lasted roughly three months. SUF ¶ 84 (September 30 through December 27, 2016); OSF ¶ 30. Even accepting Hernández's allegations of a five-month-long impairment and of discrimination as true, her fracture did not rise to the level of a disability, so she is not protected by the Rehabilitation Act. Hernández suffered only a transitory impairment, so her claim of discrimination has no legal basis. 42 U.S.C. §§ 12102(3)(A), (B). Accordingly, the government's motion for summary judgment as to the disability discrimination claim is granted.

### Discrimination on the Basis of National Origin

Hernández alleges that she has been "the victim of a hostile work environment" at the DEA because of her national origin, a Title VII violation. Compl. ¶¶ 1.43–1.44. Title VII prohibits employers from discriminating against any individual "because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). To prove a hostile work environment, the plaintiff must show:

> (1) that he is a member of a protected class; (2) that he was subjected to unwelcome harassment; (3) that the harassment was based on his membership in a protected class; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of his employment and create an abusive work environment; (5) that the objectionable conduct was objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established.

*Orr v. Mukasey*, 631 F. Supp. 2d 138, 151 (D.P.R. 2009). Although this is a fact-specific inquiry, "summary judgment is an appropriate vehicle for 'policing the baseline for hostile environment claims.'" *Pomales v. Celulares Telefonica, Inc.*, 447 F.3d 79, 83 (1st Cir. 2006) (quoting *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1244 (11th Cir. 1999) (en banc)).

---

[6] Hernández also suffers from a blood condition which caused her to take time off work for tests, surgery, and recovery in 2015. The condition did not limit her ability to perform her job's essential functions and she never requested a reasonable accommodation for the condition. SUF ¶¶ 60–62; OSF ¶ 21. Therefore, there is no disability discrimination claim based on this condition.

Hernández claims Puerto Rican and Hispanic heritage so she is a member of a protected class. Compl. ¶ 1.3. Hernández cites two incidents as evidence of hostility based on her national origin. There is no controversy as to either. "ASA Joseph, Plaintiff's direct supervisor, has on multiple occasions told her that she is part of the 'Puerto Rican Mafia,' a group ASA Joseph says he is 'going to get rid of.'" Compl. ¶ 1.24. Both parties agree, however, that Hernández "has never heard ASAC Joseph say ['Puerto Rican Mafia'], nor has he ever made reference to a 'Puerto Rican Mafia' to her." SUF ¶ 85; OSF ¶ 30. In fact, Hernández heard from coworkers that Joseph had used the phrase "Puerto Rican Mafia" and is not aware of the context in which he used it, but she inferred that she was part of the "Puerto Rican Mafia." SUF ¶¶ 86, 87; OSF ¶ 30. In the second instance, Joseph made remarks about "Those people," "Your people," and "The people that you defend" to Hernández in a meeting in which she requested a job downgrade. SUF ¶ 87; OSF ¶ 30. At her deposition, Hernández explained that Joseph's message, which he wished her to tell Iván Lugo, concerned his negative impression of the Ponce District and Diversion Offices, and his intent to "get rid of personnel." SUF ¶ 88; OSF ¶ 30. Hernández further recalled that Joseph told her the supervisors were "not good," and he "put[] personnel down," which Hernández did not like and chose to ignore. *Id.* Because Hernandez is the non-movant, we assume that Hernández correctly believed Joseph referred to Puerto Ricans rather than to her former colleagues in the Diversion Office or her old team.

An environment must be objectively hostile or abusive, which is measured by the frequency of discrimination, its severity; whether it is merely offensive, or it is threatening and humiliating; and whether it unreasonably interferes in work performance. *Marrero v. Goya of P.R., Inc.*, 304 F.3d 7, at 18–19 (1st Cir. 2002). "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal marks and citations omitted); *accord Rivera-Rivera v. Medina & Medina, Inc.*, 898 F.3d 77, 93 (1st Cir. 2018). Harassment that might not be severe may create a hostile work environment if it is sufficiently pervasive. *Rivera-Rivera*, 898 F.3d at 93.

The first incident, which Hernández admits she heard at least second-hand, resembles a "teasing offhand comment." The record supports its use only once and in the absence of any context; even if used in a discriminatory way, its use was isolated and non-recurring. The second incident was similarly isolated and non-severe but could reasonably be construed as offensive or even humiliating. Hernández even admitted to simply ignoring some of these remarks, which undercuts arguments on the fifth element that she perceived the comments as hostile or abusive. SUF ¶ 88; OSF ¶ 30; *see also Orr*, 631 F. Supp. 2d at 151.

Joseph's comments must be judged within the circumstances, though; while ill-conceived and ill-expressed, they were neither frequent nor severe and had little impact on Hernández's work. *See Rivera-Rivera*, 898 F.3d at 91. Joseph's two, isolated remarks are easily distinguished from instances in which courts found discrimination. *See, e.g.*, *id.* at 93 (district court's summary judgment overturned where plaintiff presented evidence that she was taunted about her age nearly every day for two years); *Orr*, 631 F. Supp. 2d 138 (affirming jury verdict of hostile work environment where supervisors often referred to plaintiff as a "gringo" and stated they would promote only Puerto Ricans and not Americans).

Furthermore, Hernández does not allege that discrimination for her Puerto Rican and Hispanic origins materially affected her employment; indeed, she hardly mentions its personal impact. *See generally*, Compl.; Dkt. 28. Hernández lost her permission to engage in outside employment, was denied a downgrade because her chosen position was already filled, and sought to distance herself from Joseph, but she does not attribute any of these to her national origin. *See* SUF ¶¶ 99, 57, 54; OSF ¶¶ 19, 21, 35; *see generally* Dkt. 28. Furthermore, Hernández maintained the same job during the relevant time period; the sole change in her responsibilities was Joseph's personal coordination of his own meetings with the Ponce Mayor's Office, which Hernández had handled prior. SUF ¶ 45; OSF ¶ 18. This appears to be the sole alteration to her employment, and it does not correlate with a suspension, loss in pay, or other change. "Case law is clear that simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment to establish and objectively

hostile or abusive work environment." *Colón-Fontánez v. Mun. of San Juan*, 660 F.3d 17, 44 (1st Cir. 2011) (internal marks omitted).

Three is no genuine dispute of material facts regarding Hernández's national origin discrimination claim. The parties agree that "Puerto Rican Mafia" was not used to describe Hernández, who remains unaware of the context in which it was said, and that Joseph, appointed to improve efficiency and accountability in the Ponce District Office, used the phrase "your people" and its derivatives. No further potentially discriminatory conduct was alleged. Severity and pervasiveness must be present to support a hostile work environment claim. Even if Joseph's comments about the mafia and "your people" were objectively and subjectively hostile to Hernández, they were non-severe and isolated. Accordingly, summary judgment on this claim is appropriate at this stage.

### Sexual Harassment

Title VII also prohibits discrimination because of sex. 42 U.S.C. § 2000e-2(a). Hernández alleges that her treatment at the Ponce District Office violated this Title VII prohibition using a hostile environment theory. Dkt. 28 at 4. The legal framework to evaluate a hostile environment claim is largely the same for sexual harassment as for national origin. To prevail, the plaintiff must establish:

> (1) that she (or he) is a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established.

*Ponte v. Steelcase Inc.*, 741 F.3d 310, 320 (1st Cir. 2014). The First Circuit sets a high bar for sexual harassment claims. "Title VII was not intended to be a general civility code; therefore, conduct must be extreme to be actionable." *Rivera-Martínez v. Puerto Rico*, Civil No. 05-2605, 2007 WL 16069, at *3-4 (1st Cir. 2007) (internal marks omitted); *see also Ponte*, 741 F.3d at 320–21 (distinguishing two isolated, non-egregious incidents as legally insufficient). On the other hand, conduct that qualifies as sexual harassment "'need not be motivated by sexual desire to support an

inference of discrimination on the basis of sex.'" *Id.* at *9 (quoting *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 80 (1998)). Disadvantageous terms or conditions or employment applied only to members of one sex also constitutes discriminatory conduct pursuant to Title VII. *Oncale*, 523 U.S. at 80.

Hernández alleges a hostile work environment due to sexual harassment by three individuals: Donahue, Joseph, and Jones. As in her national origin claim, Hernández must demonstrate the severity and pervasiveness of the harassment and that it was objectively and subjectively offensive. Severity and pervasiveness are determined by weighing the conduct's severity, its frequency, whether it is physically threatening, and whether it interferes with the plaintiff's work performance. *Ponte*, 741 F.3d at 320 (citing *Gerald v. Univ. of P.R.*, 707 F.3d 7, 18 (1st Cir. 2013)).

The first instance of sexual harassment was Jones's swearing at Hernández in the middle of a verbal altercation. While admittedly unprofessional, Jones used a single, non-gendered curse word in a non-sexual way during a purely work-related fight. SUF ¶ 93; OSF ¶ 32. It is not severe, and, though the context could have made it threatening, it is hard to see how this contextualized behavior could be sexual harassment. In addition, the incident occurred once. It is not sufficiently severe for a single instance to qualify as creating a hostile work environment. *Ponte*, 741 F.3d at 320–21. Although Hernández was temporarily assigned to San Juan after the incident, the posting did not affect her pay or benefits. SUF ¶ 95–96; OSF ¶¶ 33–34.

Aside from the fight with Jones, Hernández did not feel sexually harassed until October 18, 2017, when she read about employees' complaints regarding her attire in Donahue's proposed suspension. SUF ¶¶ 105–107; OSF ¶ 36. Receiving the notice from Donahue, Hernández explains, made her feel that she was being sexually harassed and watched. SUF ¶¶ 105–107; OSF ¶ 36. Hernández, after reading the proposal, believed that Joseph, by looking at her constantly and asking her to come into his office, was sexually harassing her. SUF ¶ 108; OSF ¶ 36. It is difficult to work with someone in the same office without looking at them, so this behavior was likely frequent. Knowing whether the conduct was qualified as harassment "based upon sex," however, requires distinguishing between leers or stares and standard eye contact, and neither party describes the alleged "watching."

With questionable severity and pervasiveness, it is not clear whether the alleged behavior physically threatened Hernández or impacted her work. Hernández admits that she was not aware

that she was being watched until she read the proposal, which suggests confirmation bias: the alleged conduct was not noticeable until Hernández looked for it. And even then, Joseph never did anything except ask Hernández to come into his office. SUF ¶ 109; OSF ¶ 36. As Joseph's secretary, she worked directly with him, but she had reduced their interactions as much as possible as early as December 2016 because she disliked him. *See* SUF ¶ 46; OSF ¶ 19. Hernández was uncomfortable between October 18, 2017 and December 2017, when she was removed from his chain of command. SUF ¶ 110; OSF ¶ 36. She does not allege that Joseph made any physical threat or proposition, or an instance in which Joseph touched her at all, let alone in a nonconsensual way. SUF ¶ 109; OSF ¶ 36. To be clear, sexual harassment can occur without physical contact, but merely feeling uncomfortable in another's presence, as stated, is not sufficient for a hostile work environment claim. *See Ponte*, 741 F.3d at 320. Hernández makes no specific allegations as to Donahue's behavior, except her general sensation of her supervisors observing her. OSF ¶ 43.

The parties agree that the only alleged sexual harassment consisted of Hernández feeling observed by her supervisors, which came about only after Donahue proposed a suspension in response to other employees feeling uncomfortable with Hernández's work attire and repeated warnings to Hernández about said attire. SUF ¶ 104; OSF ¶ 36. In the absence of severe or pervasive harassment based upon sex, this falls below the baseline of what constitutes sexual harassment pursuant to Title VII. Summary judgment in the government's favor is appropriate on this claim.

### Title VII Retaliation

To establish a prima facie case of retaliation, a plaintiff must show "that (1) he engaged in protected conduct; (2) he experienced an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse employment action." *Garcia-Garcia v. Costco Wholesale Corp.*, 878 F.3d 411, 425 (1st Cir. 2017) (citing *Calero-Cerezo*, 355 F.3d at 25). An employee has engaged in protected conduct if she has "opposed any practice made an unlawful employment practice by" or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" Title VII. 42 U.S.C. § 2000e-3(a); *see also Fantini v. Salem State Coll.*, 557 F.3d 22, 32 (1st Cir. 2009). Unlawful practices, as stated, include discrimination based on an "individual's race, color, religion, sex, or national origin." 42 U.S.C. §

2000e-2(a). The employee's complaint does not need to be successful; a reasonable belief that there was a Title VII violation is sufficient. *Petitti v. New England Tel. & Tel. Co.*, 909 F.2d 28, 33 (1st Cir. 1990). The protected conduct is considered a cause of the adverse employment action if one of the employer's motives was to discriminate. *Roy v. Correct Care Sols., LLC*, 914 F.3d 52, 62 (1st Cir. 2019) (citing *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 343 (2013) (rejecting former "but-for" and "sole cause" requirements)). There may be an inference of causation if there is temporal proximity between the protected conduct and the time the alleged adverse employment action took place. *Bibiloni Del Valle v. Puerto Rico*, 661 F. Supp. 2d 155, 173 (D.P.R. 2009).

If the plaintiff makes this prima facie showing, then the defendant bears the burden "to offer a legitimate, nonretaliatory reason for [its] actions." *Collazo-Rosado v. Univ. of P.R.*, 765 F.3d 86, 92 (1st Cir. 2014). If the defendant does so, the plaintiff must show that reason is "mere pretext" to prevail. "To establish pretext, she must show that the explanation was a lie, which would let a factfinder infer that the defendants made the story up to cover their tracks." *Id.*

Hernández alleges DEA retaliation for her discrimination complaints to the EEO, but she does not specify which complaints, so the court will consider each in turn. Compl. ¶ 1.53. Hernández, during the course of her DEA employment, filed four EEO complaints: in 2000 or 2001 for a work evaluation; in December 2015 against Carter for verbal harassment; on November 22, 2016 for national origin, disability, and retaliation; and in September 12, 2017 for sexual harassment and retaliation. SUF ¶¶ 37–38, 117, 92; OSF ¶¶ 13, 38, 31. The Rehabilitation Act rather than Title VII supports Hernández's disability discrimination claim. For that reason, the court will not consider her claims for retaliation based on disability or denial of her reasonable accommodation requests. *See Santana v. P.R. Ports Auth.*, 472 F. Supp. 2d 144, 150 (D.P.R. 2007) (*sua sponte* dismissing Title VII disability discrimination claim because "the material facts are crystal clear" and "amending the complaint would be futile"). Likewise, work grievances and verbal altercations, topics of her first two EEO complaints, are not protected activity. Any allegation that she reasonably believed there was a Title VII violation is undercut by Hernandez's

own admission that she had online and in-person trainings on what constituted discriminatory and retaliatory conduct. *See* SUF ¶¶ 3–4, 6–9; OSF ¶ 1.

Hernández's EEO complaints for alleged discrimination based on national origin and sex qualify as protected conduct. *See* 42 U.S.C. § 2000e-2(a) (prohibiting discrimination "because of . . . sex, or national origin"). Even assuming Hernández's disability discrimination claims were protected conduct or it was reasonable for her to assume that they were, she does not establish a prima facie case. Hernández alleged that the government "has altered unjustly the terms, conditions and privileges of Hernández due to her protected actions" but does not describe those alterations. Compl. ¶ 1.54. In her opposition to the government's instant motion, Hernández discussed the legal standards in the case without explaining how the facts support her claim. *See* Dkt. 28. Instead, she offers only a conclusory assertion that her complaints caused an adverse employment reaction, which the First Circuit explicitly disallows. *See Medina-Muñoz*, 896 F.2d at 8. Although Hernández alleged retaliation in her Complaint, she has not clarified for the court or opposing counsel a single example of what she considers retaliation for her protected conduct. She cites four days on which retaliatory events occurred in her November 22, 2016 EEO complaint, but never identifies any specific events that took place on those days. *See* Dkt. 25-44; *see generally*, Compl.; Dkt. 28; OSF. The closest is her relationship with Joseph being "not good" as of December 13, 2016. This is not good enough.

It is "not enough merely to mention a possible argument in the most skeletal way," so it is certainly insufficient to not mention an argument at all in the hopes that the opposing party or court will "do counsel's work, create the ossature for the argument, and put flesh on its bones." *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990). Judges are not mind readers, so plaintiff must spell out her arguments if she wishes them to be considered. *Id.* "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *Id.* Because Hernández failed to present competent evidence to make her prima facie showing, summary judgment for the defendant is appropriate on the retaliation claims.

**CONCLUSION**

For the foregoing reasons, Defendant's motion for summary judgment is **GRANTED**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 29th day of March, 2019.

*S/ Bruce J. McGiverin*
BRUCE J. MCGIVERIN
United States Magistrate Judge